IN THE UNTED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES D. ROBINSON; JOHN M. MARSZALEK;  )
NATALIA E. LaVALLIE;  )
MATTHEW D. SORENSON;  )
ILLINOIS STATE RIFLE ASSOCIATION; and  )
SECOND AMENDMENT FOUNDATION, INC.  )
  )
    Plaintiffs,  )
  )    No. 1:20 CV 4270
  v.  )
  )
BRENDAN F. KELLY, in his official capacity as  )
Director of the Illinois State Police; and  )
JAROD INGEBRIGTSEN, in his official capacity  )
as Bureau Chief of the Illinois State Police  )
Firearms Services Bureau,  )
  )
    Defendants.  )

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

COME NOW the Plaintiffs, ILLINOIS STATE RIFLE ASSOCIATION and

SECOND AMENDMENT FOUNDATION, INC., by and through undersigned

counsel, and for their Reply to Defendants' Response to their Motion for the entry of

a Preliminary Injunction, states as follows:

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES ............................................................. ii

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................... 2

I.  Plaintiffs are likely to succeed on the merits of their constitutional claims. ...... 2

    A.  Plaintiffs are likely to succeed on the merits of their Second Amendment claim. ................................................................................. 2

        1.  Defendants' delays infringe a right within the scope of the Second Amendment. ...................................................................... 2

        2.  Defendants have not met their burden to establish a close fit between indefinitely delaying all citizens' constitutional rights and preventing potentially dangerous people from obtaining firearms. ........................... 4

    B.  Plaintiffs are likely to succeed on the merits of their due process claim. ......................................................................................... 10

    C.  The Organizational Plaintiffs have standing. ......................................... 13

        1.  The ISRA has a sufficient cognizable injury that satisfies standing. 13

        2.  The ISRA and SAF have standing to pursue claims for their membership. ................................................................................ 16

    D.  COVID-19 does not excuse or justify Defendants' violations of constitutional rights. ................................................................. 21

II.  Plaintiffs will suffer irreparable harm without an injunction. ......................... 24

III.  The balance of harms favors an injunction. ................................................. 24

IV.  Plaintiffs may obtain relief through a preliminary injunction. ....................... 29

    A.  Federal case law does not call for abstention from injunctive relief. ..... 29

    B.  Preliminary injunctive relief is practical. ............................................... 31

# TABLE OF AUTHORITIES

## Cases

*Big Tyme Investments, LLC v. Edwards,*
__ F.3d __, 2021 WL 118628 (5th Cir. 2021)................................................................ 22

*Calvary Chapel Dayton Valley v. Sisolak,*
140 S. Ct. 2604 (2020)........................................................................................ 22

*Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.,*
741 F.3d 769 (7th Cir. 2013)................................................................................ 12

*Courthouse News Service v. Brown,*
908 F.3d 1063 (7th Cir. 2018).............................................................................. 29

*Craig v. Boren,*
429 U.S. 190 (1976).............................................................................................. 15

*Disability Rights Wisc. Inc. v. Walworth Cty. Bd. of Supervisors,*
522 F.3d 796 (7th Cir. 2008)................................................................................ 17

*District of Columbia v. Heller,*
554 U.S. 570 (2008)................................................................................... 2, 3, 31

*Doe v. E. St. Louis Housing Auth.,*
No. 3:18-cv-00545 (S.D. Ill. 2019)....................................................................... 28

*Eldridge v. Challenging Law Enforcement Official,*
No. 17-cv-4241, 2018 WL 1561729 (N.D. Ill. Mar. 30, 2018) ..................................... 11

*Elrod v. Burns,*
427 U.S. 347 (1976).............................................................................................. 4

*Ex Parte Young,*
209 U.S. 123 (1908)............................................................................................. 25

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011)...................................................................... passim

*Hosp. Council of W. Pa. v. City of Pittsburgh,*
949 F.2d 83 (3d Cir. 1991) .................................................................................. 20

*Ill. Ass'n of Firearms Retailers v. City of Chicago,*
961 F.Supp.2d 928 (N.D. Ill. 2014)....................................................................... 6

*Jacobson v. Commonwealth of Massachusetts,*
197 U.S. 11 (1905) ............................................................................. 21, 22, 23

*Joelner v. Vill. of Wash. Park,*
378 F.3d 613 (7th Cir. 2004) ............................................................................ 26

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019) ............................................................................. 3

*Mainstreet Org. of Realtors v. Calumet City,*
505 F.3d 742 (7th Cir. 2007) ............................................................................ 15

*Marin-Garcia v. Holder,*
647 F.3d 666 (7th Cir. 2011) ............................................................................ 19

*Moore v. Madigan,*
702 F.3d 933 (7th Cir. 2012) ....................................................................... 6, 8, 9

*NAACP v. City of Richmond,*
743 F.2d 1346 (9th Cir. 1994) ............................................................................ 5

*Newsom v. Albemarle County. Sch. Bd.,*
354 F.3d 249 (4th Cir. 2003) ............................................................................ 26

*Nken v. Holder,*
556 U.S. 418 (2009) ............................................................................................ 26

*Pennhurst State School and Hospital v. Halderman,*
465 U.S. 89 (1984) .............................................................................................. 30

*Porter v. Nussle,*
534 U.S. 516 (2002) ............................................................................................ 11

*Proft v. Madigan,*
340 F.Supp.3d 683 (N.D. Ill. 2018) .................................................................. 25

*Retired Chi. Police Ass'n v. City of Chicago,*
7 F.3d 584 (7th Cir. 1989) ................................................................................. 20

*Rhein v. Coffman,*
825 F.3d 823 (7th Cir. 2017) ............................................................................ 11

*Rizzo v. Goode,*
423 U.S. 362 (1976) ............................................................................................ 29

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020)................................................................................................... 22

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009)............................................................................................ 17, 18

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,*
830 F.2d 1374 (7th Cir.1987)..................................................................................... 18

*Tent City Organizers v. City of Chicago Dept. of Admin. Hearings,*
No 17 C 4518, 2018 WL 2709431 (N.D. Ill. June 5, 2018) ........................................ 19

*United States v. Skoien,*
614 F.3d 638 (7th Cir. 2010).......................................................................................... 3

*United States v. Williams,*
616 F.3d 685 (7th Cir. 2010)......................................................................................... 3

*Warth v. Seldin,*
422 U.S. 490 (1975)................................................................................................... 20

## Statutes

18 U.S.C. § 922(t)...................................................................................................... 27

42 U.S.C. § 1983........................................................................................................ 30

430 ILCS 65/10..................................................................................................... 11, 12

430 ILCS 65/14.......................................................................................................... 16

430 ILCS 65/4............................................................................................................ 25

430 ILCS 65/8............................................................................................................ 27

430 ILCS 65/9.5......................................................................................................... 27

430 ILCS 66/5............................................................................................................ 32

## Other Authorities

Amended Complaint (Doc. 16), *Thomas v. Kelly*, No. 1:20 CV 734 (N.D. Ill. June 16,
2020).......................................................................................................................... 12

iv

Gary Kleck and Mark Gertz, *Armed Resistance To Crime: The Prevalence and Nature of Self-Defense With A Gun*, Nw. J. Criminal Law and Criminology, Vol. 86 (1995) ............................................................................................. 27, 28

Gary Kleck, *The Frequency of Defensive Gun Use*, Armed (2001) ........................... 27

*Illinois Gun Buyers Now Waiting More Than 60 Days for FOID Card*, CBS Chicago, Mar. 27, 2013 ................................................................................................. 21

John O. McGinnis, *Gun Rights Delayed Can Be Gun Rights Denied*, 304 U. Ill. L.J. Online 302 (2020) ........................................................................... passim

Kavahn Mansouri, *Judge Rules Ban on Gun Ownership in East St. Louis Housing is Unconstitutional*, Belleville News-Democrat, Apr. 11, 2019 ................................... 28

**INTRODUCTION**

The Court should grant Plaintiffs' motion for preliminary injunction. Plaintiffs are likely to succeed on the merits of their Second Amendment claim because Defendants have failed justify indefinitely, completely depriving law-abiding citizens of their Second Amendment rights. Defendants' violations of Second Amendment rights inflict irreparable constitutional harm, and the balance of harms favors an injunction.

Defendants' suggestions that their failure to timely process Firearm Owners Identification ("FOID") cards is temporary, due to COVID-19, or improving cannot justify denying an injunction. *See* Resp. 7-8. The Defendants' delays long predate the COVID-19 pandemic, and Defendants have presented no reason to believe that their addition of just four more staff members to process FOID card applications will end the delays in the near future or ever. Plaintiffs' members' Second Amendment rights will only be protected if this Court enters an injunction.

## ARGUMENT

I.    **Plaintiffs are likely to succeed on the merits of their constitutional claims.**

    A.    **Plaintiffs are likely to succeed on the merits of their Second Amendment claim.**

Plaintiffs are likely to succeed on the merits of their Second Amendment claim. Contrary to Defendants' assertions, the Defendants' FOID delays affect a right within the scope of the Second Amendment: namely, the right of law-abiding citizens to possess a firearm for self-defense in the home. And the state's interest in keeping firearms out of the hands of potentially dangerous individuals, though important, cannot justify that severe infringement.

        1.    **Defendants' delays infringe a right within the scope of the Second Amendment.**

Defendants argue that Plaintiffs lose at step one of the Second Amendment analysis, which considers whether the government can show that the challenged statute or actions "regulate[] activity falling outside the scope of the Second Amendment." *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011). Defendants assert that their delays in issuing FOID cards do not affect any right within the scope of the Second Amendment because they occur as part of a "regulatory mechanism … to ensure that dangerous persons—such as felons and the mentally ill—do not possess firearms," citing *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). Resp. 20-21.

But neither the Supreme Court nor the Seventh Circuit has held that felons and the mentally ill are entirely outside the Second Amendment's protection, so

that any restriction on their possession of firearms is *per se* exempt from Second Amendment scrutiny. "*Heller* did not answer this question," and the Seventh Circuit has declined to do so. *Kanter v. Barr*, 919 F.3d 437, 445-47 (7th Cir. 2019); *but see id.* at 451-53 (Barrett, J., dissenting) (concluding that felons' rights are within the Second Amendment's scope). *See also United States v. Williams*, 616 F.3d 685, 691-94 (7th Cir. 2010) (applying Second Amendment scrutiny in challenge to felon-in-possession statute); *United States v. Skoien*, 614 F.3d 638, 639-40 (7th Cir. 2010) (same).

In any event, the Court need not resolve that issue here because the state's FOID delays do not only affect felons and the mentally ill; they also—*primarily*—severely infringe the Second Amendment rights of *all* Illinoisans who want to possess a firearm in the state by prohibiting them from doing so unless and until the state satisfies itself that they are not disqualified. Indeed, it is certain that the overwhelming majority of people whose rights are affected by these delays are—like every individual who has been a Plaintiff or has been identified as a member of the Organizational Plaintiffs in this case—*not* felons or mentally ill.

Thus, the Defendants' actions infringe the rights of law-abiding, otherwise qualified citizens to possess a firearm for self-defense in the home—a right that is not just within the Second Amendment's scope, but at its core.[1] *See Heller*, 554 U.S. at 630. Whether the state can justify that infringement based on its interest in

---

[1] In their argument on Plaintiffs' due process claim, Defendants admit that "the right at issue is fundamental." Resp. 26.

keeping guns out of the hands of potentially dangerous people is a separate question, which the Court must analyze in the second part of its analysis.

> **2.     Defendants have not met their burden to establish a close fit between indefinitely delaying all citizens' constitutional rights and preventing potentially dangerous people from obtaining firearms.**

Because Defendants' FOID delays affect rights within the Second Amendment's scope, the Court must "inquir[e] into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights," considering the "regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Ezell*, 651 F.3d at 703. A "severe burden" requires an "extremely strong public-interest justification and a close fit between the government's means and its end." *Id.* at 708. Here, the government asserts an important interest—preventing dangerous people from possessing firearms—but cannot show that the means it has used—a permitting process that indefinitely deprives law-abiding citizens of all Second Amendment rights—are justified.

Defendants' failure to timely issue FOID cards severely burdens law-abiding citizens' Second Amendment rights because it completely and indefinitely deprives them of their right to keep and bear arms for self-defense in the home. Defendants downplay the severity of that restriction by describing it as "temporary" and "short-term." Resp. 23. But a temporary total deprivation of constitutional rights is still a deprivation and still inflicts severe injury. *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Ezell*, 651 F.3d at 699 (violations of

4

Second Amendment rights inherently inflict irreparable harm). And often, a right delayed is a right *totally* denied. In the First Amendment context,

> simple delay may permanently vitiate the expressive content of a demonstration. A spontaneous parade expressing a viewpoint on a topical issue will almost inevitably attract more participants and more press attention … than the 'same' parade 20 days later. The later parade can never be the same. Where spontaneity is part of the message, dissemination delayed is dissemination denied.

*NAACP v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1994). And "[j]ust as the First Amendment can be abridged by an unreasonable time to get permits to demonstrate, so can also the Second Amendment be infringed by an unreasonable time to get a gun license. In the first case, the citizen loses the opportunity for timely speech and in the second for timely protection." John O. McGinnis, *Gun Rights Delayed Can Be Gun Rights Denied*, 304 U. Ill. L.J. Online 302, 317 (2020).

Defendants try to justify their infringement of law-abiding citizens' rights by citing the State's interest in preventing potentially dangerous people from obtaining firearms. But that is not enough, even under less-than-strict Second Amendment scrutiny: Defendants must establish, not only that their impingement on Second Amendment rights serves an important interest, but also that there is "a close fit between the [restriction] and the actual public interests it serves." *Ezell*, 651 F.3d at 708-09.

Defendants have not met their burden. Where the government restricts the rights of "the entire law-abiding adult population of Illinois," not just the rights of potentially dangerous people, it must make a "stronger showing" that its restriction

5

is "vital to public safety." *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012). It is not enough that the restriction is a "rational" means of serving the government's interest, and Defendants cannot prevail simply because "the public *might* benefit on balance" from the delays. *Id.* Rather, Defendants must show *with evidence* that public safety justifies the restriction on the rights of the overwhelming majority of Illinoisans who are law abiding and not presumptively dangerous. *Id.* at 939-40.

Applying these principles, the Seventh Circuit struck down the state's ban on the carrying of loaded firearms in *Moore*. The Court acknowledged that the ban would prevent some violent crimes from occurring, but concluded that "the mere possibility that allowing guns to be carried in public would increase the crime or death rates" could not "suffice[] to justify a ban." *Id.* at 939. Instead, the government had to establish that its restriction was actually necessary, and that it could not serve its interests by less restrictive means. *Id.* at 939-40. The Court struck down the ban, concluding that "Illinois has lots of options for protecting its people from being shot without having to eliminate all possibility of armed self-defense in public." *Id.* at 940.

Similarly, when this Court struck down Chicago's ban on gun stores, it concluded that the means the City chose—"banning the entire *category* of legitimate businesses"—was not a proportionate means of addressing "the potential threat that *some* otherwise-legitimate businesses may break the law." *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928, 940 (N.D. Ill. 2014). The Court noted that the City could "enact more appropriately tailored … regulations—

short of the complete ban—on sales and transfers of firearms to minimize the access of criminals to firearms and to track the ownership of firearms," but a "flat ban … [did] not fit closely with those goals." *Id.* at 946-47.

Here, Defendants argue as though FOID delays are essential to prevent dangerous people from obtaining firearms. But it has not established that with evidence, and there are strong reasons to doubt this claim.

Presumably Defendants could timely process FOID applications if the State simply devoted sufficient resources toward that end. The Illinois General Assembly made the judgment that Defendants could do so when it imposed the FOID Card Act's 30-day time limit. And Defendants have not argued that timely processing applications is impossible. They make excuses for why they have not timely processed applications, and identify some measures they have taken to attempt to mitigate the problem, but that only shows that what the State has done so far is not enough; in a phrase, "too little too late." That this would cost more money cannot justify Defendants' denial of Plaintiffs' constitutional rights, just as "[t]he cost of processing licenses for demonstrations protected under the First Amendment would never conceivably be held as justification for delay." McGinnis, *supra* at 317.

Defendants say that some delays are the result of having to wait for information from out-of-state law enforcement agencies. MTD 6. But Defendants have presented no evidence that such delays account for the majority of FOID delays or the 122-day average wait time. And if Illinoisans' ability to exercise their Second Amendment rights depends on unknown officials of *other* states taking

action, with no time limit and no accountability to the people of Illinois, that hardly bolsters the case for the FOID delays' constitutionality.

Further, there is no evidence that adequately (at least preliminarily) checking someone's background should actually have to take more than 30 days, or much time at all. In fact, the federal government's National Instant Criminal Background System for gun purchases now requires *no waiting period at all*. McGinnis, *supra* at 318.

Another reason to believe that a permitting process of indefinite duration is not essential to protect the public from dangerous people is because 48 other states serve that interest without any law comparable to the FOID Card Act—let alone a permitting process of indefinite duration. Only Illinois and Massachusetts require citizens to obtain a permit to possess any type of firearm.

In striking down Illinois's ban on carrying ready-to-use firearms, the Seventh Circuit noted that Illinois was the only state to have such a law. *Moore*, 702 F.2d at 940. The court observed: "It is not that all states but Illinois [were] indifferent to the dangers that widespread public carrying of guns may pose," but other states had struck a different "balance" by using means that did not restrict the rights of "responsible persons." *Id.* And Illinois had no "unique characteristic of criminal activity" that could "justif[y] the state's taking a different approach from the other 49 states." *Id.*

Here, other states' laws suggest that Illinois does not need a permitting process that indefinitely deprives all law-abiding citizens of all of their Second

8

Amendment rights unless and until the State gets around to satisfying itself that they are qualified. Defendants—who bear the burden to justify their infringement of Second Amendment rights—have presented no evidence to the contrary. As it is, the State's broken system is just a ban by another name.

Finally, Defendants have not even shown that the FOID delays actually serve public safety on balance. On the one hand, the delays (*i.e.*, Defendants' practice of completing their usual process before issuing a FOID card, rather than just issuing cards to people who have not been found to be disqualified within 30 days) could prevent some dangerous people from obtaining guns and thus might prevent some violent crimes from occurring. On the other hand, the delays also prevent many law-abiding qualified citizens from obtaining guns to use in self-defense, and thus might prevent some individuals from defending themselves against violent crime. The latter effect could be especially large "in a period of civil unrest" when "more law abiding, wholly sane adults will feel the need for protection." McGinnis, *supra* at 318.

In sum, Defendants have not established—or provided any reason to believe that they are likely to establish—the required "fit" between the state's total restriction of *all* citizens' constitutional rights while FOID card applications are pending longer than 30 days and its interest in preventing a relatively few potentially dangerous individuals from obtaining firearms. *Cf. Moore*, 702 F.3d at 940. Plaintiffs therefore are likely to succeed on the merits of their Second Amendment claim.

### B. Plaintiffs are likely to succeed on the merits of their due process claim.

Plaintiffs are also likely to succeed on the merits of their claim that
Defendants' indefinite delays in considering FOID card applications violate the Due
Process Clause of the Fourteenth Amendment.

Defendants argue that Plaintiffs are unlikely to succeed on this claim
because they supposedly "have not provided any suggestion as to what process is
appropriate outside of their demand that all cards be processed within thirty days
and that all affected SAF and ISRA members be immediately issued FOID cards."
Resp. 26. In fact, Plaintiffs have explained what is appropriate: processing
applications within 30 days, because due process demands (among other things)
that where a fundamental right is at stake, the government grant or deny a license
or permit to exercise the right within a specific and brief period. *See* Mot. 14.

Defendants assert that "provid[ing] another layer" of procedural due process
would impose an "untenable burden" on them. Resp. 26. But the Illinois General
Assembly has determined that processing FOID card applications within 30 days is
a burden Defendants can and should bear. And, again, Defendants have offered no
reason to believe that timely processing applications would impose an impossible
burden if the State were to devote sufficient resources to the task.

Defendants also suggest (*id.* at 27) that individuals do not have a due process
right to have their FOID card applications timely processed based on a district court
decision that concluded that "there does not appear to be a clearly established
constitutional right regarding the timing of decisions that impact gun-possession

10

rights." *Eldridge v. Challenging Law Enforcement Official*, No. 17-cv-4241, 2018 WL
1561729, *6 (N.D. Ill. Mar. 30, 2018). But that decision only considered whether a
right to have a concealed carry license application timely processed was "clearly
established" *for purposes of qualified immunity*. *Id* at *5. An inquiry into whether
qualified immunity protects a government official from personal liability turns on
whether there is *already* controlling case law, or a "clear trend" in non-controlling
case law, establishing a constitutional right in a "particularized sense." *Id*. A
determination that a right is not "clearly established" for purposes of qualified
immunity is not a ruling on the merits of a plaintiff's constitutional claim. *See id.*
Thus, *Eldridge* concluded that constitutional right at issue was not "clearly
established" because the Seventh Circuit had expressly declined to address it, so it
still "need[ed] to be worked out" by the courts. *See id.* at *5-6 (quoting *Rhein v.
Coffman*, 825 F.3d 823, 826-27 (7th Cir. 2017)). The Court expressed no opinion on
the merits. *See id.*

Defendants also argue that "Plaintiffs should not be allowed to pursue their
due process challenge" because they did not seek to appeal Defendants' failure to act
on their applications to the Director of State police as state law, 430 ILCS 65/10,
allows. Resp. 28. But Defendants then admit that this argument has no merit,
stating correctly that "Plaintiffs do not generally need to exhaust their
administrative remedies before filing suit under section 1983. *See Porter v. Nussle*,
534 U.S. 516, 524 (2002) (noting only prisoners must exhaust administrative
remedies under section 1983)." Resp. 28. Besides, pursuing the statutory appeal

11

process would be futile and would not remedy Plaintiffs' Due Process Clause injury because (1) the statute imposes no time limit for resolution of a FOID card application appeal, *see* 430 ILCS 65/10, and (2) the state's delays in processing FOID card appeals are even longer than its delays in processing FOID card applications and are therefore the subject of their own Second Amendment and Due Process Clause challenges in the "related" case the Court is considering together with this case. *See* Amended Complaint (Doc. 16), *Thomas v. Kelly*, No. 1:20 CV 734 (N.D. Ill. June 16, 2020). This argument is both meritless and disingenuous.

Finally, Defendants argue that their failure to comply with the statutory 30-day time limit cannot give rise to a due process claim because violations of state procedural laws "do not amount to a federal due process claim." Resp. 28. And it is true that procedures prescribed by a state statute cannot give rise to an "independent substantive right" to have the state follow its own rules. *Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 773 (7th Cir. 2013). But Plaintiffs do not argue that the FOID Card Act independently creates a substantive right. Rather, they are seeking to enforce their right under the Due Process Clause to have their applications to exercise their constitutional rights decided within a specific and brief time period—*a right that would exist even if the FOID Card Act imposed no time limit on Defendants.*

As it happens, the FOID Card Act provides for a specific and (arguably) brief time period of 30 days—so if the Defendants obeyed that statute, Plaintiffs

(*arguendo*) would not have a Due Process Clause claim.[2] But because Defendants disregard the statutory deadline, the State does not provide a specific and brief time within which FOID card applicants will have their applications approved or denied; it is as though the statutory time limit does not exist. Plaintiffs' Due Process Clause injury arises out of the resulting lack of any specific, brief time limit for licensing decisions—not out of Defendants' failure to comply with state law, *per se*.

Because all of Defendants' arguments on the merits of Plaintiffs' due process claim fail, Defendants have not shown that Plaintiffs are not likely to succeed on the merits of their Due Process claim.

### C. The Organizational Plaintiffs have standing.

There is no merit in Defendants' arguments that the Organizational Plaintiffs lack standing. The ISRA has standing on its own behalf, and both Organizational Plaintiffs have associational standing on their members' behalf.

#### 1. The ISRA has a sufficient cognizable injury that satisfies standing.

The ISRA has standing on its own behalf because it operates a firing range in Bonfield, Illinois (the "Bonfield Range"), from which it earns revenue from the fees ISRA members must pay for separate range membership, and possession of a valid FOID card is a prerequisite to range membership. The Defendants' failure to timely process FOID card applications harms ISRA because it deprives ISRA of revenue it

---

[2] Plaintiffs assume for the sake of argument that 30 days is a sufficiently brief time period to comport with the Due Process Clause. One could, however, argue that the Second Amendment calls for an even shorter time limit, particularly where circumstances present an urgent need for self-defense. *See* McGinnis, *supra* at 316-17.

would otherwise receive while would-be members wait to receive their FOID cards. Amended Complaint ("AC"), Dkt 40, ¶¶ 16 and 55.

The Defendants' arguments, purportedly based on *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), suggest that, because the Bonfield Range is distant from Chicago and is not the only range in Illinois (in supposed contrast with the range in *Ezell*, which was to be the only range in Chicago), the ISRA cannot claim an Article III injury. *See* Response, p. 15. This novel theory, however, does not comport with *Ezell* or the myriad other cases addressing independent organizational injury. Indeed, the Seventh Circuit resoundingly rejected virtually identical arguments in *Ezell*, 651 F.3d at 696-97. In that case, the district court had denied a preliminary injunction against Chicago's ban on firing ranges because "the plaintiffs [had] failed to produce 'evidence of any one resident [of Chicago] who has been unable to travel to ... a range [or] has been unable to obtain [the] range training' required for a Permit." *Id.* at 696. The Court deemed that "irrelevant" because standing does not "depend[] on this kind of evidence." *Id.* "The availability of range training outside the city" could not defeat the plaintiffs' claims or standing:

> The question is not whether or how easily Chicago residents can comply with the range-training requirement by traveling outside the city; the plaintiffs are not seeking an injunction against the range-training requirement. The pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city; that ranges are present in neighboring jurisdictions has no bearing on this question.

*Id.*

Here, the pertinent question is not whether individuals have traveled or will travel to the Bonfield Range due to its "isolated" location but whether the reduction in the number of FOID card holders, because of the Defendants' failure to timely issue FOID cards, presents the possibility of injury to the ISRA through loss of revenue from the Bonfield Range.

The precedents are clear that injury claims like ISRA's satisfy the injury requirement for Article III standing. Summarizing the law on and addressing the issue of organizational injury, the Seventh Circuit stated that "standing in the Article III sense does not require a certainty or even a very high probability that the plaintiff is complaining about a real injury, suffered or threatened." *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 744 (7th Cir. 2007). The court further explained that standings exists "as long as there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit if successful would redress. As we have noted repeatedly, the fact that a loss or other harm on which a suit is based is probabilistic rather than certain does not defeat standing." *Id.* at 745. "All that a plaintiff need show to establish standing to sue [in the Article III sense] is a reasonable probability—not a certainty—of suffering tangible harm unless he obtains the relief that he is seeking in the suit." *Id.*

Further, the Supreme Court has long recognized that a vendor has standing to pursue constitutional claims challenging prohibitions on sales to a particular group of consumers. In *Craig v. Boren*, 429 U.S. 190, 194-95 (1976), the Court held that a beer vendor was injured by a ban on the sale of 3.2% beer to young males

15

because she was forced to choose between following the law and subjecting herself to sanctions by disobeying it. Because the ban injured the vendor, she was "entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail." *Id.* at 195. The ISRA is in the same position: if it were to knowingly allow individuals who lack FOID cards (due to delay) to use its range, it could suffer severe sanctions for aiding and abetting criminal conduct. *Cf.* 430 ILCS 65/14 (providing criminal penalties for possession of a firearm without a FOID card). Therefore, the Defendants' FOID delays injure the ISRA and it is entitled to assert the "concomitant rights" of its would-be patrons.

Thus, the Defendants' argument that the ISRA does not have standing in its own right to pursue redress for its independent injury is simply wrong.

### 2. The ISRA and SAF have standing to pursue claims for their membership.

The ISRA and SAF also have standing on behalf of their affected members. An association has standing on its members' behalf if: (1) the association's members would otherwise have standing to sue in their own right; (2) the interests the associations seek to protect are germane to their organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual association members in the lawsuit. *Ezell*, 651 F.3d at 696. As in *Ezell*, both the ISRA and SAF have satisfied these elements.

The ISRA and SAF have shown that the first criteria is satisfied here: the ISRA has provided the pertinent details of two of its members who have been

16

waiting for extended periods of time to obtain their FOID cards, and SAF has likewise identified a member who has not received his FOID card notwithstanding his application in June 2020. *See* Pearson Declaration (Dkt 48-2), ¶¶ 7 and 8; Declaration of Julianne H. Versnel (Dkt 48-3), ¶6. Both declarants also state they have received telephone calls and emails from other members of their respective organizations likewise complaining that they have not received their FOID cards after waiting longer than the 30-day statutory period.

The Defendants, while acknowledging that such members may remain anonymous under *Disability Rights Wisc. Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796 (7th Cir. 2008), argue that the allegations are not sufficient but are "blanket and conclusory assertion of harm to two unnamed members." Response, p. 18. In support of this, the Defendants rely on *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009). Yet, on examination, *Summers* is inapposite.

The organizations in *Summers* challenged certain Forest Service internal regulations, not a law or rule directly affecting the organizations or their members. This aspect alone distinguishes *Summers* from the instant case because, as the Supreme Court noted, *id* at 493: "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Here, the ISRA's and SAF's affected members are in fact the object of the FOID card system: the FOID Card Act prohibits them from possessing a firearm or ammunition without the card for which they applied and have waited well beyond the 30-day time period.

17

In addition, the organizational plaintiffs in *Summers*, unlike the Organizational Plaintiffs here, could not establish harm to their members. The *Summers* organizations could not show by way of affidavit that any of their members had tried to or planned to visit lands actually subject to the contested regulations. An affidavit alleging *past* injury from development on Forest Service land could not suffice because it did not identify a particular site, and "because it relate[d] to past injury rather than imminent future injury that is sought to be enjoined." *Id.* at 495.

Unlike the *Summers* affiant, the individuals identified in the ISRA and SAF declarations are *directly* affected by the government inaction they challenge: they have actually applied for a FOID card and have not received it within the 30-day statutory time limit.[3]  This establishes the injury—a deprivation of the ability to exercise their Second Amendment right to keep and bear arms.

Plaintiffs have also established the second associational standing element: that the interests they seek to protect are germane to their organizations' purposes. In attempting to refute this, Defendants provide no more than a general case citation and a statement that this element is not satisfied; they provide no analysis or statement of why Plaintiffs' claims are insufficient.  *Cf. Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374 (7th Cir.1987)

---

[3] As of January 29, 2021, the 55-year old ISRA and SAF member who applied for a FOID card in June, 2020, still has not received it. *See* Declaration of Richard Pearson, attached hereto as Exhibit 1. Plaintiffs also attach Declarations from additional affected ISRA members, Alexey Alekseev, Andrew T. Schamaun, Benjamin T. Kirkland, and Pamela S. DiCarlantonio, as Group Exhibit 2.

(association failed second prong because of conflict of interest between association and some of its members). Moreover, the relationship between the Organizational Plaintiffs' purposes and constitutional claims is obvious, and Defendants' assertion to the contrary borders on the spurious. Defendants do not dispute that the ISRA's "organizational purposes [include *securing the constitutional right to privately own and possess firearms* within Illinois, through education, outreach, and litigation," AC ¶ 15 (emphasis added), and that the SAF's "organizational purposes [] include education, research, publishing, and legal action focusing on the *constitutional right privately to own and possess firearms*," AC ¶ 19 (emphasis added). Defendants apparently assert that they know what serves the Organizational Plaintiffs' interests better than the organizations do, arguing that Defendants' implementation of the FOID Card Act actually *serves* the Organizational Plaintiffs' purposes. Resp. 19. But that is plainly not true: the organizations *favor* private possession of firearms, and they challenge Defendants' interference with it. The Plaintiffs stand on their own allegations of organization purpose.

Finally, the Organizational Plaintiffs satisfy the third prong of associational standing because neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Defendants errantly rely on "third party plaintiff" precedents that cause it to conflate pure third party standing with associational standing. Indeed, neither of the cases relied on by the Defendants, *Tent City Organizers v. City of Chicago Dept. of Admin. Hearings*, No 17 C 4518, 2018 WL 2709431 (N.D. Ill. June 5, 2018) and *Marin-Garcia v. Holder*,

19

647 F.3d 666 (7th Cir. 2011), involved claims made by associations representing their membership.

On point on this third element is *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584 (7th Cir. 1989). In that case, the Seventh Circuit conducted a thorough analysis of the elements of associational standing, particularly the third element. The court noted that the Supreme Court had held that "'so long as the nature of the claim and the relief sought does not make individual participation of *each* injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.'" *Id.* at 601 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added)). But the court concluded that an organization does not lack standing simply because *some* members might have to participate. *Id.* at 601-02 (citing *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) (Alito, J.)).

Here, Defendants have presented no basis to conclude that each affected ISRA and SAF member would have to participate in this litigation based either on the nature of their claims or on the relief requested. The issues in this case do not pertain to disputed issues of fact regarding any affected individual, and the relief requested is the same as to all affected individuals.

Because the ISRA and SAF can effectively litigate the constitutional claims it has raised on behalf of its members without the participation of each affected member, and the Defendants have made no substantive challenge as to why they

20

cannot, the Defendants' argument that the ISRA and SAF lack association standing is incorrect.

### D. COVID-19 does not excuse or justify Defendants' violations of constitutional rights.

The COVID-19 pandemic does not justify or excuse Defendants' failure to timely process FOID card applications.

Defendants' persistent failure to issue FOID cards within 30 days, as state law requires, long predates the COVID-19 pandemic. It has been well known for years. *See, e.g., Illinois Gun Buyers Now Waiting More Than 60 Days for FOID Card*, CBS Chicago, Mar. 27, 2013 (noting an average delay of at least 64 days and a backlog of 70,000 applications).[4]

Of course Defendants' longstanding failure to implement procedures for the timely processing of FOID card applications made the delay problem even worse once the pandemic and the surge of applications arrived in 2020.[5] But that is a reason why the time has come to remedy that failure—not a reason to excuse it or rationalize it. Defendants should not be allowed to use COVID-19 to escape accountability for violations of constitutional rights they have been committing for nearly a decade.

Defendants cannot avoid their constitutional responsibilities by just citing *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 29 (1905), which stated

---

[4] https://chicago.cbslocal.com/2013/03/27/illinois-gun-buyers-now-waiting-more-than-60-days-for-foid-card/

[5] If anything, the surge in applications due to civil unrest and increased crime makes the timely processing of FOID Card applications *more* essential under the Second Amendment. *See* McGinnis, *supra* at 317.

that "the rights of the individual in respect to his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."

Although some courts have cited *Jacobson* in deferring to restrictions imposed to mitigate the COVID-19 pandemic, that case does not provide an appropriate standard for judging emergency public health measures in 2021. When the Supreme Court recently enjoined New York's restrictions on religious gatherings, it applied strict scrutiny and made no reference to *Jacobson*. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020); "; but see *id.* at 70 (Gorsuch, J.) ("Jacobson hardly supports cutting the Constitution loose during a pandemic.").[6]

In an earlier case presenting a similar issue (which the Court declined to hear), Justice Alito stated that it would be "a mistake to take language in *Jacobson* as the last word on what the Constitution allows public officials to do during the COVID-19 pandemic." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2604, 2608 (2020) (mem.) (Alito, J., dissenting from summary denial of application for injunctive relief). He explained that *Jacobson* "primarily involved a substantive due process challenge to a local ordinance requiring residents to be vaccinated for smallpox," so it would be a "considerable stretch" to read it "as establishing the test

---

[6] *Cuomo* involved a restriction on religious gatherings, but there is no reason why a restriction on Second Amendment rights should receive greater deference. After all, there may be "reasonable alternatives" to in-person gatherings through which individuals might exercise their First Amendment rights, such as Zoom conferences. But citizens who have been totally deprived of their Second Amendment rights have no reasonable alternative. *See* McGinnis, *supra* at 319-20.

to be applied when statewide measures of indefinite duration are challenged under… [constitutional] provisions not at issue in that case." *Id. See also Big Tyme Investments, LLC v. Edwards*, __ F.3d __, 2021 WL 118628, *10 (5th Cir. 2021) (Willett, J., concurring) (stating that *Jacobson* should not "suppl[y] the standard by which courts in 2021 must assess emergency public health measures" because it "predates modern constitutional analysis, particularly the … tiers of scrutiny that distinguish between strongly and weakly protected rights").

Moreover, *Jacobson* calls, at most, for deference when courts consider emergency *public health measures*, such as the mandatory vaccines at issue in that case, or measures specifically directed at mitigating the COVID-19 pandemic. Defendants have not cited any case in which a court has relied on *Jacobson* to justify a violation of constitutional rights that was not specifically directed at mitigating the pandemic or a similar emergency.

And in any event, there is no reason why the COVID-19 pandemic—which began nearly a year ago, and to which other government agencies, most schools, and the private sector have long since adapted—should excuse Defendants' ongoing delays. In the face of the pandemic, necessary activities, and many non-essential activities, have gone on as usual. The government still provides other essential (and non-essential) services. Consumer goods of all kinds are still produced; store shelves remain fully stocked.

So if Defendants have had difficulty timely processing FOID card applications during the pandemic, it is for the same reason that they failed to timely

process FOID card applications for many years before the pandemic: because the State has been unwilling to devote the necessary resources to the task. Defendants have provided no evidence that the State's use of resources for COVID-19-related activities made it impossible for the State to provide Defendants with sufficient resources to timely process FOID card applications. Defendants have provided no evidence for the (implausible) notion that, since the pandemic, the State has only or mostly devoted its resources to purposes that are more important than the protection of fundamental constitutional rights.

## II.   Plaintiffs will suffer irreparable harm without an injunction.

Unless the Court enters an injunction, Plaintiffs will suffer irreparable harm. Defendants argue that an infringement of Second Amendment rights does not "automatically" constitute an irreparable harm. Resp. 31. But the Seventh Circuit has said otherwise: *Ezell* held that the Second Amendment protects "intangible and unquantifiable interests" and that infringements of "the right to possess firearms for protection … cannot be compensated by damages" and therefore inherently inflict irreparable injury. 651 F.3d at 699.

## III.   The balance of harms favors an injunction.

The balance of harms favors an injunction. As Plaintiffs argued in support of their motion (at 20), Plaintiffs will suffer irreparable harm from continued deprivation of their Second Amendment rights, but Defendants will suffer no cognizable harm from being required to obey state law and respect law-abiding citizens' constitutional rights.

Defendants do not articulate any specific harm that Defendants would suffer if the Court were to grant Plaintiffs' motion, except to argue that "any time a State is enjoined from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Resp. 32 (quoting *Proft v. Madigan*, 340 F.Supp.3d 683, 695 (N.D. Ill. 2018)). But of course Plaintiffs filed this lawsuit because Defendants have *failed to effectuate state law*, and Plaintiffs ask the Court for declaratory and injunctive relief to compel Defendants to *obey* state law,[7] which would eliminate Plaintiffs' constitutional injury. (As discussed above and below, however, Plaintiffs' claims arise under federal law because Plaintiffs seek to enjoin violations of their federal constitutional rights, as the Eleventh Amendment and *Ex Parte Young*, 209 U.S. 123 (1908), allow.)

True, Plaintiffs seek a preliminary injunction to have the state issue their FOID cards immediately, even if the State does not complete its usual process to confirm that Plaintiffs are not disqualified. But Plaintiffs have submitted affidavits to confirm that they are qualified under the statute. In fact, in the statutorily mandated application, FOID card applicants must affirm, among other things, that she/he is not a convicted felon, has not been a patient in a mental health facility in the past five years, and is not addicted to narcotics. 430 ILCS 65/4(ii) – (iv).

Defendants' assertion that the "public interest" is necessarily identical to ("merged with") the government's interest is false. *See* Resp. 32. The case on which

---

[7] As discussed above, Plaintiffs' claim is based on federal law, not state law, but Defendants could eliminate the federal constitutional violations by obeying state law.

25

Defendants rely for this argument did not address the criteria for issuing a preliminary injunction; it addressed the factors for issuing a stay of removal of an alien from the country under a federal immigration statute. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Courts have *not* held that the government's asserted interests are identical to the public interest where a plaintiff seeks a preliminary injunction against state or local laws alleged to be unconstitutional (let alone where, as here, plaintiffs seek an injunction against *violations* of state law alleged to be unconstitutional). To the contrary, courts have often held that the protection of constitutional rights against infringement by the government serves the public interest. *See, e.g., Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("[I]t is always in the public interest to protect First Amendment liberties."); *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest."). That only makes sense in a system of government in which the Constitution—not the will of government officials—is supreme.

Defendants argue that the public interest disfavors an injunction because of the risk that they could issue a FOID card to a Plaintiff who is not qualified to have one. But Defendants overstate that risk. Again, 48 states protect public safety without requiring citizens to obtain a license before they can possess a firearm at home, so an injunction would simply put Illinois in the same position as those other states with respect to these particular individuals. And, this position need not be permanent; the ability to process applications faster, and within the required 30

days, is in the Defendants' *own hands*. *Cf. Ezell*, 651 F.3d at 711 ("regulatory vacuum" resulting from preliminary injunction did not warrant denying the injunction because government could "move[] with dispatch" to address it).

Moreover, federal law provides *several layers* of protection against the very concerns the Defendants raise. Foremost, federal background checks ensure that disqualified persons cannot purchase a firearm. See 18 U.S.C. § 922(t). Also, there is little risk that the Plaintiffs are dangerous felons or other prohibited persons because, if they were, federal law would prohibit them from possessing a firearm, and it therefore would make no sense for them to pursue a firearm through lawful channels, which requires an application under oath with criminal penalties for lying (this is also true of the FOID application). And even if the State were to issue a FOID card to a disqualified individual, it could quickly remedy that error upon completing its background checks and revoking the individual's card, and then contacting local police for any required enforcement regarding the retrieval of revoked FOID cards and any firearms, just as it does for other FOID card holders after discovering that they are disqualified. See 430 ILCS 65/8, 65/9.5.

Further, Defendants largely ignore the potential harm to public safety that could result from *not* issuing Plaintiffs their FOID cards—*i.e.*, the possibility that, if the Plaintiffs do not immediately receive a FOID card, one or more of them might face a need to defend themselves and be unable to do so. At least nineteen professionally conducted national surveys have specifically asked respondents

27

whether they had used a gun for self-protection. Despite wide variation in the details of the surveys, all indicated huge numbers of defensive gun uses each year, ranging from 800,000 to 3.6 million. Gary Kleck, *The Frequency of Defensive Gun Use*, Armed, Ch. 6, pp. 214-229 (2001). The most technically sound of the surveys indicated there were 2.5 million defensive gun uses in 1992. Gary Kleck and Mark Gertz, *Armed Resistance To Crime: The Prevalence and Nature of Self-Defense With A Gun*, Nw. J. Criminal Law and Criminology, Vol. 86, p.164 (1995).

On a more personal level, and as only one example, there is the terrifying story of N. Doe, who sued the East St. Louis Housing Authority anonymously— because she was afraid of the ex-paramour convicted of attempted murder who threatened to kill her if he ever found her—who was only saved from a sexual assault *in her own home* because her son went to get the gun they kept in the house. The ESLHA then threatened to evict her for possessing a firearm in her own home, but a Court injunction preserved her ability to defend herself and her family. *See* Kavahn Mansouri, *Judge Rules Ban on Gun Ownership in East St. Louis Housing is Unconstitutional*, Belleville News-Democrat, Apr. 11, 2019.[8] . The lawsuit was docketed as *Doe v. E. St. Louis Housing Auth.*, No. 3:18-cv-00545 (S.D. Ill. 2019).

Further, Defendants have not presented any reason to believe that there is a greater risk that one of the Plaintiffs (a) is not qualified to receive a card *and* (b) would commit a violent crime if he or she received a card in the relatively short time

---

[8] https://www.bnd.com/news/local/article229129134.html

period during which the State completed its process to confirm that the Plaintiffs are qualified. Defendants accuse the Plaintiffs of fear-mongering, but that (plus bureaucratic inefficiency) is actually the Defendants' entire argument.

## IV.    Plaintiffs may obtain relief through a preliminary injunction.

Finally, the Court should reject Defendants' arguments that injunctive relief is improper based on the relief that Plaintiffs seek.

### A.    Federal case law does not call for abstention from injunctive relief.

There is no merit in Defendants' argument that the Court "should abstain from providing [preliminary injunctive] relief under *Rizzo v. Goode*, 423 U.S. 362 (1976)," in which the Supreme Court recognized "that the Government has traditionally been granted widest latitude in the 'dispatch of its own internal affairs.'" Resp. 12 (quoting *Rizzo*, 423 U.S. at 378-79).

*Rizzo* is nothing like this case. There, the plaintiffs literally sought to have federal courts tell the Philadelphia Police Department how to run its internal affairs. They asked a district court to impose "prophylactic procedures" to reduce police misconduct, and the injunction the court entered "significantly revis[ed] the internal procedures of the Philadelphia police department." *Rizzo*, 423 U.S. at 378-79.

Here, in contrast, Plaintiffs are not asking the Court to manage the Defendants' internal affairs. Plaintiffs are not asking to tell Defendants how they should process FOID card applications, except that they should do so—by *some* effective means—within 30 days.

Defendants' argument receives no support from the other case they cite, *Courthouse News Service v. Brown*, 908 F.3d 1063 (7th Cir. 2018). In that case, the plaintiff sought an injunction to direct the clerk of the Cook County Circuit Court to make newly filed complaints available to the media immediately after they are filed, rather than after the clerk had processed them. *Id.* at 1065. The Court abstained from hearing the plaintiff's constitutional claim—something Defendants do not argue is warranted here—because "the principle of comity takes on special force when federal courts are asked to decide how state *courts* should conduct their business." *Id.* at 1074 (emphasis added).

There is also no merit in Defendants' argument that Plaintiffs' motion for a preliminary injunction is an attempt to enforce state law in federal court that violates the Eleventh Amendment under *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984). Resp. 12. It is well established that plaintiffs may obtain a federal court injunction against state official to prevent violations of federal constitutional rights, based on the supremacy of the U.S. Constitution. *See Pennhurst*, 465 U.S. at 104-05 (citing *Ex Parte Young*, 209 U.S. at 160). In *Pennhurst*, the Court held that plaintiffs may not obtain relief against state officials on the basis of *state* law because that would "not vindicate the supreme authority of federal law." *Id.* at 106.

Here, Plaintiffs found their claims exclusively on federal law—the Second Amendment, the Due Process Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983—not state law. True, the federal constitutional violations Plaintiffs seek to

enjoin are the result of Defendants' failure to comply with state law, so that, as it happens, Defendants could remedy the federal constitutional violations by conforming their conduct to state law. But state law does not provide the basis for relief. If the FOID Card Act did not impose a deadline for processing FOID card applications, but were otherwise the same, Plaintiffs would still have the same causes of action based on Defendants' failure to issue FOID cards within a reasonable time.

### B.  Preliminary injunctive relief is practical.

Defendants lack any basis for their assertion that it would be "virtually impossible" for the Court to grant the relief that Plaintiffs seek. Resp. 13. Plaintiffs seek FOID cards for qualified members of the ISRA and SAF who have applied for cards but have not received their cards within 30 days. Plaintiffs are prepared to identify those members on a rolling basis—through affidavits from each affected member confirming his or her eligibility—so that Defendants may promptly issue their cards.

Defendants say that doing this would be "in violation of the eligibility requirements of the FOID Card Act and possibly federal law." *Id.* But where fundamental federal constitutional rights (including the Second Amendment right to possess a firearm within the home) and state law conflict, constitutional rights should take priority. *See Heller*, 554 U.S. at 635 (holding that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). And there is no

31

basis for Defendants' assertion that this would "possibly" violate federal law. Federal law does not require states to have a permitting system for mere possession of any firearm in the home, and 48 states lack any such system. Again, if those states can protect the public safety without any FOID-like scheme, there is no reason to believe that the State of Illinois could not issue these individuals FOID cards for the brief period of time between an individual's filing of an application and Defendants' approval or denial of the application. And if the State finds that distasteful, it can avoid it by just doing what it takes to timely process all applications.

WHEREFORE, the Plaintiffs, ILLINOIS STATE RIFLE ASSOCIATION and SECOND AMENDMENT FOUNDATION, INC., respectfully request that this Court enter an order:

1.     Preliminarily enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from failing to comply with the 30-day FOID application processing requirement of 430 ILCS 66/5;

2.     Requiring Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, to immediately issue FOID cards to the affected members of ISRA and SAF.

Dated: January 29, 2021            Respectfully submitted,

By:          /s/ David G. Sigale
              David G. Sigale

By:          /s/ Gregory A. Bedell
              Gregory A. Bedell

By:          /s/ Jacob Huebert
              Jacob Huebert

Attorneys for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547
dsigale@sigalelaw.com

Gregory A. Bedell (Atty. ID# 6189762)
KNABE & BEDELL
33 North Dearborn Street
10th Floor
Chicago, Illinois 60602
312.977.9119
gbedell@kkbchicago.com

Jacob Huebert (Atty. ID# 6305339)
Martha Astor (*pro hac vice*)
Scharf-Norton Center for Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Road
Phoenix, Arizona 85004
Telephone: 602.462.5000
litigation@goldwaterinstitute.org

*Attorneys for Plaintiffs*