## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOHN M. MARSZALEK, *et al.*,

Plaintiffs,

v.

BRENDAN F. KELLY, in his official
capacity as Director of the Illinois
State Police; and JAROD
INGEBRIGTSEN, in his official
capacity as Bureau Chief of the Illinois
State Police Firearms Services Bureau,

Defendants.

Case No. 20-cv-04270

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

The individual and organizational plaintiffs bring this action against officials of
the Illinois State Police (ISP) alleging violations of their Second and Fourteenth
Amendment rights. The claims arise from the ISP's delays in granting to applicants
Firearm Owners Identification (FOID) cards necessary to legally possess a firearm in
Illinois. The plaintiffs John Marszalek, the Illinois State Rifle Association (ISRA),
and the Second Amendment Foundation (SAF) have moved for a preliminary
injunction against the defendants directing them to immediately issue FOID cards to
Marszalek and affected members of ISRA and the SAF. For the reasons state below,
the plaintiffs' Motion [47] is denied.

## STANDARD

"A preliminary injunction is an extraordinary remedy." *Whitaker v. Kenosha
Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). *See also*

1

*Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) ("a preliminary injunction is an exercise of a very far-reaching power, never to be indulged [] except in a case clearly demanding it.") (cleaned up).

The party seeking a preliminary injunction must make an initial threshold showing that: (1) it has some likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; and (3) there is no adequate remedy at law. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079 (7th Cir. 2008). *See also Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Demonstrating a likelihood of success is "a significant burden," though "at such a preliminary stage, the applicant need not show that it definitely will win the case." *Id.* (noting that the "better than negligible" standard has been retired). "A 'strong' showing thus does not mean proof by a preponderance…[b]ut it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id*. If the moving party fails to demonstrate "any one of the[] three threshold requirements, [the court] must deny the injunction." *Girl Scouts of Manitou,* 549 F.3d at 1086.

If the moving party makes the initial showing, the court then balances the irreparable harm that the moving party would endure without a preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. *Id*. "This Circuit employs a sliding scale approach for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more

2

that balance would need to weigh in its favor." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019), cert. denied sub nom. 140 S. Ct. 268, 205 L. Ed. 2d 137 (2019) (internal citations and quotations omitted). Finally, the court considers "whether the preliminary injunction is in the public interest, which entails taking into account any effects on non-parties." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). "Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted." *Id*.

## BACKGROUND

The facts herein are taken from the plaintiffs' Second Amended Complaint (Dkt. 40), their Motion for Preliminary Injunction (Dkt. 48), their Reply (Dkt. 73), and the defendants' Response (Dkt. 67). In support of the Motion, the plaintiffs submitted declarations from John Marszalek (Dkt. 48-1); Richard Pearson, the Executive Director of ISRA (Dkt. 48-2, Dkt. 73-1); Julianne Versnel, the Director of Operations of the SAF (Dkt. 48-3); Alexey Alekseev (Dkt. 73-2); Andrew Schamaun (Dkt.73-2); Benjamin Kirkland (Dkt. 73-2); and Pamela DiCarlantonio (Dkt. 73-2), along with a supporting exhibit. The defendants submitted a declaration from Gregory Hacker, the acting commander of the ISP's Firearms Services Bureau (Dkt. 67-1), and a supporting exhibit.[1]

Marszalek is a resident of Carol Stream, Illinois. Dkt. 40, Am. Compl. ¶ 12. ISRA is a non-profit organization incorporated in Illinois. *Id.* at ¶ 15. ISRA has 26,000 members in the state, and its purposes include "securing the constitutional right to

---

[1] "Affidavits are ordinarily inadmissible at trials but they are fully admissible in summary proceedings, including preliminary-injunction proceedings." *Ty, Inc.*, 132 F.3d at 1171.

privately own and possess firearms within Illinois, through education, outreach, and litigation." *Id*. The SAF is a non-profit organization incorporated in Washington with over 650,000 members and supporters. *Id*. at ¶ 19. Its purposes include "education, research, publishing, and legal action focusing on the constitutional right privately to own and possess firearms." *Id*. Kelly and Ingebrigtsen are officials with the ISP responsible for managing programs related to firearms. *Id*. at ¶¶ 24-25.

Illinois law requires that individuals obtain a FOID card before they may legally possess a firearm or ammunition. *Id*. at ¶¶ 27-28. The ISP is responsible for reviewing FOID applications and issuing FOID cards. *Id*.  Illinois law requires that the ISP approve or deny applications within 30 days of receiving them. *Id*. at ¶ 29. The ISP is required to grant a card unless the applicant is disqualified by a factor listed in the relevant statute. *Id*. at ¶ 19.

Despite the statutory requirement, the ISP often takes longer than 30 days to review applications and issue FOID cards. *Id*. at ¶ 19. As of October 2020, it took 116 days on average to process an application. Dkt. 48, Mot. at 7. The ISP says that applications can be delayed for several reasons, such as gathering information from out-of-state law enforcement agencies. Dkt. 67, Resp. at 11. In 2020, the ISP processed an average of 15,891 applications a month. *Id*. The backlog has been exacerbated by the Covid-19 pandemic and summer protests, with the ISP seeing a surge in applications at the same time that remote work hampered the training of new analysts. *Id*. at 11-12.

On May 4, 2020, Marszalek applied for an FOID card. The application was approved on December 3, 2020 and mailed on January 2, 2021, after the instant Motion was filed. Dkt. 67-1, Hacker Decl. ¶ 3. ISRA and SAF, however, state that other members of their organizations qualify for cards and have been waiting for more than 30 days. Pearson identifies a 55-year-old man and a 76-year-old who are both members of ISRA who have been waiting since June 2020. Dkt. 48-2, Pearson Decl. ¶¶ 7-8. In a later declaration, Pearson affirms that the 55-year-old is still waiting for his FOID card. Dkt. 73-1, Pearson Decl. ¶ 3. Versnel identifies a 55-year-old man as an SAF member who has also been waiting since last June. Dkt. 48-3, Versnel Decl. ¶ 6. In their Reply, the plaintiffs provide declarations from four other ISRA members stating that they qualify for FOID cards and have had applications pending for more than 30 days. *See* Dkt. 73-2. Finally, ISRA operates a firing range in Bonfield, Illinois. Dkt. 40, Am. Compl. ¶ 16. In order to gain access to the range, ISRA members must purchase a range membership for $600 from the organization and have a valid FOID card. *Id.* at ¶ 55.

On July 20, 2020, the present lawsuit was filed. Subsequently, however, many of the individual plaintiffs' claims were rendered moot because they received their FOID cards. On December 15, 2020, Marszalek and the organizational plaintiffs filed this Motion for Preliminary Injunction. They seek a preliminary injunction directing the

defendants to immediately issue FOID cards to Marszalek and all affected members of ISRA and the SAF.[2]

## ANALYSIS

As stated, in order to obtain a preliminary injunction, the plaintiffs must establish that they have a likelihood of success on the merits; will suffer irreparable harm if an injunction is not granted; and lack an adequate remedy at law. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A.*, Inc., 549 F.3d 1079 (7th Cir. 2008). If that hurdle is cleared, the court must balance the harms that would be imposed by granting or denying the injunction. *Id*. In this case, the plaintiffs' Motion fails at the first step. The defendants present two different arguments as to why the plaintiffs are unlikely to succeed on the merits—first, that the plaintiffs lack standing and, second, that their substantive claims will fail.

### A. The Organizational Plaintiffs Have Standing

The defendants first argue that the plaintiffs are unlikely to succeed on the merits because their claims are moot or they lack standing. According to an uncontested declaration supplied by the defendants, Marszalek received his FOID card subsequent to the filing of the present motion. Dkt. 67-1, Hacker Decl. ¶ 3. As a result, his claim for injunctive relief is now moot. *See Brown v. Bartholomew Consol.*, 442 F.3d 588, 596 (7th Cir. 2006). Without Marszalek, only ISRA and the SAF remain to litigate this case.

---

[2] It is unclear how many FOID cards the plaintiffs are requesting be issued. At a hearing, the plaintiffs' counsel did not know what percentage of ISRA and SAF members currently have FOID cards, and the Motion does not identify how many affected members there are.

The defendants assert that ISRA and SAF lack standing to bring this action. In order to establish Article III standing a plaintiff must show that she has suffered an "injury in fact;" that there is a causal connection between the injury and the defendant's actions; and that the injury is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). A mere "abstract interest" in a particular topic is not enough to grant standing. *Muro v. Target Corp.*, 580 F.3d 485, 491 (7th Cir. 2009).

Along with their own standing, organizations may also assert standing on behalf of their members. An organization may exercise such associational standing when: "(1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Disability Rts. Wisconsin, Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 801 (7th Cir. 2008). The plaintiffs insist that ISRA has standing in itself and that ISRA and SAF have standing on behalf of their members.

*The Organizational Plaintiffs Lack Standing in Themselves*

In support of ISRA's standing, the plaintiffs rely on the shooting rang that ISRA operates in Bonfield, Illinois. It is available to ISRA members who pay an additional $600 annual fee. To use the range, however, the member must have an FOID card. So, the plaintiffs assert, ISRA is harmed by the long delays in FOID card processing because it denies them revenue they otherwise would receive. Importantly, however,

they do not claim that any delayed member would actually purchase a range membership.

In order to show an injury, a plaintiff must assert "some nonnegligible, nontheoretical, probability of harm." *MainStreet Org. of Realtors v. Calumet City*, Ill., 505 F.3d 742, 744 (7th Cir. 2007). A harm that is probabilistic, for example a proposed ordinance that may increase or decrease property values, can provide standing. *See id*. But the harm claimed here is not an identified harm that has some percentage of likelihood to arise from a particular action. Instead, it is speculation that more ISRA members with FOID cards may translate into more range revenue. The mere theoretical possibility that someone would purchase a range pass is not enough to confer standing. This is reinforced by the fact that, as the defendants point out, the shooting range is located in a town of about four hundred people around fifty miles from Cook County.

The plaintiffs correctly state that loss of revenue can be a cognizable injury. *See Craig v. Boren*, 429 U.S. 190 (1976) (holding that a beer vendor prohibited from selling to young men had standing to sue for discrimination). But in *Craig*, there was no question as to whether the plaintiff had potential customers. Here, the plaintiffs have conspicuously failed to plead that any of the appealing ISRA members would shell out the $600 in additional member dues in order to access the ISRA shooting range. As a result, the organization does not have standing on its own behalf.

*ISRA and the SAF Have Associational Standing*

In order to establish associational standing, the organization must have members who "would otherwise have standing to sue in their own right." *Disability Rts. Wisconsin*, 522 F.3d at 801. Only one qualifying member is needed to satisfy this requirement, and he need not be named. *Id.* at 802. Still, the plaintiff must make "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). In *Summers*, the Supreme Court held that the organizational plaintiff lacked standing to challenge an agency regulation affecting logging. In support of its standing, the organization had submitted a declaration by a member who hoped to one day visit a specific national forest, who said that his enjoyment of the trip would be marred by planned logging there. *Id.* at 495-96. The Court found this individual did not have an injury in fact because the "vague desire" to visit a place was not sufficiently imminent. *Id.* at 496. Because the individual had not suffered an injury in fact, the organization to which he belonged did not have standing to sue on his behalf.

In the present case, by contrast, ISRA and the SAF have alleged that at least one member of both organizations is currently awaiting an FOID card after having applied over 30 days ago. There is no question of imminence—the applicant is currently suffering the harm about which the organizations complain. He clearly would have standing to sue on his own, and so he can bestow associational standing on ISRA and the SAF.

The defendants argue that the Court should not accept "the organizations' self-descriptions of their membership." *Id.* at 499. Instead, the Court has "an independent obligation to assure that standing exists." *Id.* But in those passages, the *Summers* majority was objecting to the dissent accepting as true allegations of harm made in the complaint but unsupported by declarations. *See id.* at 506-07 (Breyer, J., dissenting). In this case, the organizations' descriptions of their membership are supported by declarations from their officers. *See* Dkt. 48-2, Pearson Decl. ¶¶ 7-8; Dkt. 48-3, Versnel Decl. ¶ 6. The Court has no reason to doubt the truthfulness of these declarations. The defendants insist that the plaintiffs must "identify members who have suffered the requisite harm." *Id.* at 499. But it is not clear how a more specific identification could be accomplished at this stage without explicitly naming the affected member, a step that associational standing does not require. *See Disability Rts. Wisconsin, Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 803 (7th Cir. 2008).

The defendants also argue that the organizational plaintiffs lack standing because it is possible that the underlying members' claims have been mooted, as occurred with the named plaintiffs. Dkt. 67, Def. Resp. at 3. In their Reply, ISRA reaffirmed that one of the previously mentioned members was still waiting for an FOID card. The plaintiffs also supplied the declarations of several other ISRA members whose FOID applications remain in limbo, suggesting that ISRA has a number of members through which it can claim standing. None of the declarations in the Reply mentioned the SAF, but the plaintiffs have not informed the Court of any change since the

original declarations were filed. Of course, "mootness doctrine requires re-evaluating the standing requirements throughout litigation." *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 929 (7th Cir. 2013). It is possible that all the affected members of the organizational plaintiffs will obtain FOID cards during this litigation, denying ISRA and SAF standing. But the Court will not make that conclusion preemptively.

ISRA and the SAF also satisfy the final two elements of associational standing. Both organizations describe their purpose as furthering the "the constitutional right to privately own and possess firearms." Dkt. 40, Am. Compl. ¶¶ 15; 19. Ensuring their members are able to legally exercise that right in a timely fashion is clearly an interest "germane to the organization's purpose." *Disability Rts. Wisconsin, Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 801 (7th Cir. 2008).

Furthermore, it is clear that the participation of individual members is not required in this lawsuit. Supreme Court precedent holds that individual participation "is not normally necessary when an association seeks prospective or injunctive relief for its members*." United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996). In cases where government practice, as opposed to policy, is at issue, the participation of some individual members may be necessary to establish the governmental practice. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 601 (7th Cir. 1993). But the Supreme Court has not limited "representational standing to cases in which it would not be necessary to take any evidence from individual members of an association." *Id.* at 602. Instead, the

requirement limits standing when "it is necessary to establish 'individualized proof' for litigants not before the court," as when bringing a claim for damages. *Id.*

In this case, the organizational plaintiffs do not seek damages on behalf of the plaintiffs. And while individual participation will be required to establish the plaintiff's allegations of the ISP's practice, it will not be necessary to establish individualized facts for every affected member of the organizational plaintiffs. The defendants cite to cases that find a presumption against granting third-party standing, but third-party standing is a legally distinct concept from associational standing, where the organization represents the interests of its members. *Compare Uptown Tent City Organizers v. City of Chicago Dep't of Admin. Hearings*, No. 17 C 4518, 2018 WL 2709431, at \*7 (N.D. Ill. June 5, 2018) (analyzing a plaintiff's third-party standing argument); *with id.* at \*\*6-7 (analyzing a plaintiff's legally distinct associational standing argument). Accordingly, ISRA and the SAF satisfy all the requirements for associational standing. In order to determine their likelihood of success, we must turn to the underlying merits of the case.

## B. The Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits of Their Second Amendment Claim

ISRA and the SAF allege violations of their members Second and Fourteenth Amendment rights. In determining whether to grant a preliminary injunction, the Court must determine whether these claims are likely to succeed on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079 (7th Cir. 2008).

Following the Supreme Court's recognition of an individual right to possess firearms in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Seventh Circuit articulated a two-step process to evaluate Second Amendment claims. *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011). The first, "threshold inquiry" asks whether "the restricted activity [is] protected by the Second Amendment in the first place." *Id*. If it is, the Court must then consider "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* at 703. To establish a likelihood of success, the plaintiffs must show the ISP's delays in granting FOID cards implicate and unduly burden the constitutional right.

*The ISP's FOID Process Implicates the Second Amendment*

Determining the scope of the Second Amendment "requires a textual and historical inquiry" into its meaning at the time it became applicable against the states through the ratification of the Fourteenth Amendment. *Ezell*, 651 F.3d at 701-02. The Supreme Court has recognized that laws prohibiting certain limited classes of people from possessing firearms, such as felons and the mentally ill, likely do not implicate the Second Amendment. *Heller*, 554 U.S. at 626. The Fifth Circuit conducted a thorough review of the historical record and identified deep historical precedents for "a variety of gun safety regulations," including those that kept "track of who in the community had guns" and that "targeted particular groups for public safety reasons" in *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012). The defendants provide further citations to historical state laws requiring background checks and permits before obtaining a

13

permit. *See* 1911 N.Y. Laws 195, at 442 § 1984; 1918 Mont. Laws 2, at 6 § 3; *see also* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 343 (2016) (describing these and other early-20[th] century regulations).

The gathered historical evidence is clear that prohibiting some classes of people from obtaining firearms does not implicate the Second Amendment. The evidence further suggests that some form of permit requirement is consistent with a historically-informed understanding of the Second Amendment. But the plaintiffs here are not challenging the permitting process set up by the Illinois legislature. Instead, they claim the ISP's processing of applications consistently and significantly exceeds the deadline set by the legislature. "The system is broken," plaintiffs lament. The relevant question, then, is whether the Second Amendment is implicated by a state agency's noncompliance with state law aimed at preventing unauthorized persons from possessing firearms, when that results in widespread delays in the ability of authorized people to possess firearms.

Neither side offers historical evidence directly responsive to the question, but the clear implication of *Heller* is that such state action must implicate the Second Amendment. In *Heller*, the Supreme Court found that the Second Amendment protected the use of firearms for the "core lawful purpose of self-defense." 554 U.S. at 630. If the ISP spent three decades vigorously reviewing *every* FOID applicant, that would effectively prevent Illinois residents from exercising that core right of the Second Amendment. If a state practice could effectively deny all residents from

keeping a firearm in their home for self-defense, that practice must implicate the Second Amendment. *See Pena v. Lindley*, 898 F.3d 969, 1010–11 (9th Cir. 2018) (Bybee, J. concurring in part and dissenting in part) (stating that a regulation that would effectively ban the commercial sale of guns cannot fall outside the scope of the Second Amendment).

Of course, the delays at issue in this case are on the order of months, not decades. But if the Second Amendment is not implicated by such delays, then Illinois residents would have no constitutional redress if the application processing time did in fact lengthen to years. Clearly, at some point, agency dithering would violate the Second Amendment. Fixing that point would be difficult, but the Court need only decide whether the ISP's current practice likely constitutes a violation. To make that determination, we must continue to *Ezell*'s second step. *See Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011).

*The ISP Delays Likely Do Not Violate the Second Amendment*

If a given practice is found to implicate the Second Amendment, the Court must then consider "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* at 703. This process requires "the court to evaluate the regulatory means the government has chosen and the public-benefits end it seeks to achieve," with the stringency of the review depending on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Id*. In order to evaluate the

constitutionality of the ISP's FOID card processing, the Court must first determine the appropriate level of scrutiny to apply.

Although *Heller* established that rational basis review was insufficient, the Supreme Court has not clearly articulated a level of scrutiny framework for the Second Amendment. *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015). Instead, the circuit courts have been left to navigate through the "'levels of scrutiny' quagmire." *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010). Drawing on Seventh Circuit case law, the litigants have proposed two competing levels of scrutiny in this case. The plaintiffs have argued that the ISP should be subjected to the "not quite 'strict scrutiny'" articulated in *Ezell*, which required an "extremely strong public-interest justification and a close fit between the government's means and its end." 651 F.3d at 708. In *Ezell*, the Seventh Circuit was evaluating a Chicago ordinance that prohibited the construction of firing ranges in the City but also required range training in order to obtain a gun permit. *Id.* at 691. The ordinance was subjected to higher review because it applied to "law-abiding, responsible citizens" and, by prohibiting Chicago residents from training in their city, it severely restricted the right to train, an essential corollary of the Second Amendment's core right to possess a gun for self-defense. *Id.* at 708. A similarly strict standard was employed in *Moore v. Madigan*, which held unconstitutional an Illinois law that prohibited almost all people from carrying a ready-to-use firearm outside of the home. 702 F.3d 933, 934 (7th Cir. 2012). Again, the law was reviewed strictly because it applied to "the entire law-abiding adult population" and it infringed what

the court recognized in that case as a core right to armed self-defense outside of the home. *Id.* at 940.

The defendants, on the other hand, argue that a standard "akin to intermediate scrutiny," which would require them to prove that the "challenged statute is substantially related to an important governmental objective," is more appropriate. *Kanter v. Barr*, 919 F.3d 437, 442 (7th Cir. 2019). This less stringent but still "strong" standard has been employed by the Seventh Circuit when evaluating federal law prohibiting the possession of firearms by certain categories of people, including unauthorized aliens and nonviolent felons. *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015); *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019).

Neither of these sets of cases are precisely analogous to the present situation. For one thing, the plaintiffs in this case are not challenging a law or regulation, but the ISP's implementation of a law. ISP's processing speed is affected by a variety of practical factors that do not, in themselves, have a Second Amendment valiance, most notably the slowdown in processing and new hire training caused by the pandemic. *See* Dkt. 67-1, Hacker Decl. ¶¶ 28-35; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 74, 208 L. Ed. 2d 206 (2020) (Kavanaugh, J., concurring) (admonishing federal courts to "afford substantial deference to state and local authorities about how best to balance competing policy considerations during the pandemic").

Also, unlike in *Ezell* and *Moore*, the FOID card delays do not represent a categorical prohibition on certain forms of core Second Amendment activity. Instead,

17

the delay is exactly that, a delay. And while the waiting periods described in the declarations, up to a year, are no doubt frustrating, they do not amount to a de facto ban on possessing firearms. *See* Dkt. 73-2, Alekseev Decl.; Dkt.73-2, Schamaun Decl.; Dkt. 73-2, Kirkland Decl.; Dkt. 73-2, DiCarlantonio Decl.

The instant case also differs from *Kanter* and *Meza-Rodriguez* because the burden affects all new applicants, not only those that belong to limited, particularly risky, categories. The delays affect the "the entire law-abiding adult population" of applicants. *Moore v. Madigan*, 702 F.3d 933, 934 (7th Cir. 2012). Of course, the FOID review process must apply to every applicant because it is the way the Illinois legislature has chosen to separate dangerous would-be-gun-owners from the larger "law-abiding" body of applicants. Its ultimate goal, preventing high-risk classes of people from obtaining firearms, likely does not implicate the Second Amendment. *See Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011). The delays are a byproduct of this constitutionally legitimate purpose. They are thus distinct from *Moore*, where the law at issue was intended to prevent almost all people from exercising a core right. *See* 702 F.3d at 934.

Without a comparable case, we must reason by imperfect analogy. In order to determine the appropriate level of scrutiny, the Court looks to "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell*, 651 F.3d at 703. Here, the burden is significantly less than that of *Ezell* and *Moore*. Instead of broadly and permanently restricting a core Second Amendment right, the ISP's process temporarily postpones its exercise as to each

individual proper gun owner. The burden of this delay on exercising a right is probably more fairly equated with a select prohibition, like those in *Kanter* and *Meza-Rodriguez*. Two other factors also counsel an intermediate review: that the delay is the byproduct of a purpose that that does not burden the Second Amendment, (i.e., preventing prohibited persons from possessing guns); and that it is taking place in the context of an international public health emergency to which state agencies have had to rapidly adjust with limited resources.

The plaintiffs argue that even a temporary delay in granting FOID cards constitutes a "severe" burden requiring stricter scrutiny. In support of this claim, the plaintiffs cite First Amendment case law. Courts have recognized that that even temporary delays in exercising one's speech rights can, in certain contexts, impose a severe burden because "[w]here spontaneity is part of the message, dissemination delayed is dissemination denied." *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984). The Second Amendment, they argue, is similarly burdened when an individual urgently desires a gun for self-defense and is forced to wait before buying one. *See* John O. McGinnis, *Gun Rights Delayed Can Be Gun Rights Denied*, 304 U. Ill. L.J. Online 302, 317 (2020) (expanding on this analogy).

The plaintiffs provide no citations to Second Amendment cases adopting the principle that even temporary delays to exercising the right necessarily constitute a severe burden. Of course, there are examples of other important constitutional rights, such as the right to a speedy trial, where considerably longer delays are constitutionally acceptable. *See Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L.

Ed. 2d 101 (1972) (holding that a five-year delay between arrest and trial was constitutional). The Seventh Circuit has suggested that the Second Amendment exists somewhere along this "spectrum," but has yet to resolve where it falls. *Rhein v. Coffman*, 825 F.3d 823, 827 (7th Cir. 2016). The long historical precedent of states requiring background checks and permits to purchase firearms, meanwhile, pushes against the view that delays constitute a *per se* severe burden. *See* David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. on Legis. 303, 343 (2016) (describing early-20th century permitting requirements).

Given that no court appears to have adopted the plaintiff's proposed approach, the Court focuses on *Ezell*'s standard for determining the appropriate level of scrutiny. 651 F.3d at 703. As discussed above, the Seventh Circuit cases suggest an intermediate review is appropriate here. As a result, the Court will employ the standard "akin to intermediate scrutiny" described in *Kanter*, asking whether the challenged practice "is substantially related to an important governmental objective."

The parties agree that the FOID process serves an important government interest—preventing unqualified people from obtaining firearms. *See United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015) ("[T]he government has a strong interest in preventing people who already have disrespected the law (including, in addition to aliens unlawfully in the country, felons, fugitives, and those convicted of misdemeanor crimes of domestic violence from possessing guns.")). From there, the analysis is straightforward. The defendants' declarations describe a thorough review process that checks to make sure an applicant is legally permitted to possess a

firearm. Dkt. 67-1, Hacker Decl. ¶¶ 4-15. Besides for some vague statements in their Reply, the plaintiffs have not alleged that the ISP does not actually follow its described procedure or that it intentionally delays applications. A process that reviews all relevant databases to ensure that an applicant is qualified to possess a firearm is clearly "substantially related" to the government's interest in preventing unqualified people from possessing firearms.

The plaintiffs argue that with more funding or alternative procedures, the ISP could process the applications within 30 days. That may well be the case. But so long as it is substantially related to an important government interest, current practice is not rendered unconstitutional by the possibility of a better (and more expensive) approach. The plaintiffs also argue that the delays must be unconstitutional because only Massachusetts and Illinois require permits before one may purchase any firearm. But, of course, a statute's constitutionality is not dependent on its widespread adoption. In *Moore*, the fact that only Illinois had a statute of the type at issue was used to support the conclusion that there was not a close fit between the statute and the government interest. *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012). However, as we have discussed, *Moore* involved a higher standard of scrutiny than is appropriate for this case.

Finally, the defendants say that the plaintiffs have not shown that the FOID process actually advances public safety. While some dangerous individuals are prevented from obtaining guns which might have been used for violent crime, law-abiding individuals also have to wait longer before they have a gun to defend

themselves, perhaps making crime more likely. But the government's interest in limiting the gun-possession to qualified individuals cannot be reduced to a single variable. For example, in *Meza-Rodriguez*, the Seventh Circuit recognized an important government interest in preventing unauthorized immigrants from obtaining firearms because they "are able purposefully to evade detection by law enforcement," even if they are no more likely to commit violent crime. 798 F.3d at 673. The government also likely has an interest in preventing people convicted of domestic violence crimes from obtaining a firearm, even if the firearm is never used to commit a violent crime, because of the added power it may give an abuser over the members of their household. Given the varied and interconnected safety values the FOID process promotes, there is a clear connection between it and the government interest.

The FOID process is substantially related to an important government interest. Although the delays are a burden on the Second Amendment rights of the applicants, they are not so severe as to render the process unconstitutional. Thus, it is unlikely that the plaintiffs will succeed on the merits of their Second Amendment claim.

### C. The Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits of Their Fourteenth Amendment Claim

Along with their Second Amendment claim, the plaintiffs assert that the ISP's delays in granting FOID cards violate their right to procedural due process under the Fourteenth Amendment. To establish a due process violation, "the plaintiffs must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.'" *Hudson v. City of Chicago*, 374

F.3d 554, 559 (7th Cir. 2004) (quoting *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir.1993)). The defendants do not contest the first two elements. Instead, they focus on whether the ISP procedure and delays amount to a denial of due process.

Due process is a "flexible" concept that varies based on the demands of a given situation. *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). In determining a process's constitutionality, the Court balances three factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safe-guards; and finally, the Government's interest." *Id.* at 559-560 (quoting *Gilbert v. Homar*, 520 U.S. 924, 931–32 (1997)).

In this case, both the government and the plaintiffs have important interests at stake. The ISP has a duty to prevent ineligible individuals from obtaining firearms, and the plaintiffs have a constitutionally protected right to keep firearms for self-defense. Unusually, there does not appear to be a risk of erroneous deprivation in this case. The plaintiffs have not alleged that they have been wrongly denied an FOID card. Instead, the problem is the length of time it takes for a card to be issued. It thus seems unlikely that additional procedures would be useful. In fact, the plaintiffs seek a functional elimination of process—requiring ISP to issue FOID cards to all applicants who belong to the organizational plaintiffs and applied more than 30 days ago. In practice, the plaintiffs do not appear to have an issue with the procedures of the FOID process, but with their pace.

Perhaps aware of the poor fit between their claim and its structure, the plaintiffs largely ignore the due process balancing framework. Instead, they argue that, when the state requires a license to exercise a constitutional right, due process requires that it be issued or denied within a "specified brief period." *Freedman v. State of Md.*, 380 U.S. 51, 59 (1965); *see also Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (also cited by the plaintiffs). But the cases cited by the plaintiffs deal with prior restraints on speech, a First Amendment issue. In *Freedman*, the Supreme Court held that a Maryland film censorship statute was unconstitutional because, in part, it required the submission of films to a censorship board that had no time limit on its review. *Freedman*, 380 U.S. at 54-55. The Court reasoned that, because only a judicial decision may impose a final restraint on speech, an agency review must be time-limited so as to prevent an end-run around the judiciary. *Id.* at 58.

The plaintiffs assume, without argument, that the "specified brief period" of review requirement is secured by due process and is applicable to interests other than those protected by the First Amendment. In actuality, the opinion is clear that this is a requirement imposed by the First Amendment, and the Court has been unable to find a Seventh Circuit or Supreme Court case that has invoked this principle in a non-First Amendment case. The Court sees no reason to extend *Freedman* to the Second Amendment. The judiciary is not ultimately responsible for determining who may possess a firearm, and so the same end-running concerns do not apply. The balance of interests, meanwhile, suggest that the FOID process is adequate from a

due process perspective. Thus, the plaintiffs are unlikely to succeed on this claim as well.

Although they have standing, the organizational plaintiffs have failed to demonstrate that they are likely to succeed on the merits. As a result, they cannot satisfy the threshold requirements and the Court must deny their Motion for a Preliminary Injunction. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

## CONCLUSION

For the stated reasons, the plaintiffs' motion for preliminary injunction [47] is denied.

E N T E R:

Dated: June 9, 2021

MARY M. ROWLAND
United States District Judge

25